**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SAL ATX, LLC | § | Case No. 23-10736-SMR |
|    Debtor | § | |
| | § | |

# AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. §1125 FOR THE DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED: JANUARY 15, 2024

**Stephen W. Sather**
BARRON & NEWBURGER, P.C.
7320 N. Mopac Expwy, Ste. 400
Austin, Texas 78731
(512) 476-9103
ssather@bn-lawyers.com

ATTORNEYS FOR DEBTOR
**SAL ATX, LLC**

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 1
   A. IDENTITY OF THE DEBTOR .................................................................................. 1
   B. GENERAL INFORMATION RE DISCLOSURE STATEMENT AND PLAN ........ 1
   C. DISCLAIMERS ......................................................................................................... 2
   D. ANSWERS TO COMMONLY ASKED QUESTIONS ............................................. 3
II. INFORMATION CONCERNING THE DEBTOR ....................................................... 7
   A. OVERVIEW OF THE DEBTOR .............................................................................. 7
   B. SIGNIFICANT EVENTS PRIOR TO BANKRUPTCY FILINGS ........................... 7
      1. *Background* .................................................................................................. 8
      2. *Events Leading to Bankruptcy* ................................................................... 8
   C. SIGNIFICANT EVENTS SINCE FILING BANKRUPTCY ................................... 8
   D. AFTER BANKRUPTCY .......................................................................................... 10
      1. Proposed Operations After Bankruptcy ..................................................... 10
   2. FUTURE MANAGEMENT OF THE DEBTOR ..................................................... 10
III. FINANCIAL INFORMATION ................................................................................... 10
   A. PRE-BANKRUPTCY ............................................................................................... 10
   B. FINANCIAL RESULTS SINCE FILING BANKRUPTCY ...................................... 11
   C. ESTIMATED FUTURE INCOME AND EXPENSES ............................................. 11
IV. ANALYSIS AND VALUATION OF PROPERTY ....................................................... 11
   A. REAL PROPERTY ................................................................................................... 11
   B. PERSONAL PROPERTY .......................................................................................... 12
   C. LIQUIDATION VALUE .......................................................................................... 12
V. SUMMARY OF PLAN OF REORGANIZATION ...................................................... 12
   A. OVERVIEW OF THE PLAN .................................................................................... 12
   B. ANALYSIS AND TREATMENT OF CLAIMS ...................................................... 13
      Class 1—Allowed Administrative Expense Claims .................................................. 13
      Class 2—Allowed Priority Claims ........................................................................... 13
      Class 3—Secured Claim of Travis County ............................................................... 14
      Class 4—Secured Claim of Magnolia BridgeCo, LLC ............................................ 14
      Class 5—Secured Claim of NIA ATX, LLC ............................................................ 14
      Class 6—Unsecured Claims ..................................................................................... 15
      Class 7—Equity Interests ......................................................................................... 15
   C. FEASIBILITY OF THE PLAN AND RISK TO CREDITORS ................................. 15
   D. REMEDIES FOR DEFAULT ................................................................................... 15
   E. CLAIMS ALLOWANCE PROCEDURE ................................................................. 16
   F. ASSUMPTION AND REJECTION OF LEASES AND CONTRACTS .................... 16
   G. RELEASES ............................................................................................................... 16
   H. RETENTION OF JURISDICTION .......................................................................... 17
   I. POST-CONFIRMATION PROCEDURE ................................................................. 17
VI. ALTERNATIVES TO THE DEBTOR'S PLAN ......................................................... 17
   A. CONVERSION ......................................................................................................... 17
   B. DISMISSAL ...................................................... ERROR! BOOKMARK NOT DEFINED.
VII. RELATIONSHIP OF DEBTOR WITH AFFILIATES ............................................. 18
VIII. TAX CONSEQUENCES .......................................................................................... 18

**IX. PENDING AND POTENTIAL LITIGATION**............................................................**19**

    **A.**   **PENDING PRE-BANKRUPTCY LITIGATION**........................................ 19

    **B.**   **CLAIMS CREATED UNDER THE BANKRUPTCY CODE**.................... 19

        **1.**    **Preferences**.............................................................................**19**

        **2.**    **Fraudulent Conveyances**.......................................................**20**

        **3.**    **Other Claims Created By the Bankruptcy Code**..................**20**

    **C.**   **NON-BANKRUPTCY CAUSES OF ACTION**......................................... 20

**X. SOLICITATION OF VOTES**.................................................................................**20**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § § § § | Chapter 11 |
| SAL ATX, LLC | § § | Case No. 23-10736-SMR |
| Debtor | § § | |

### AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. §1125 FOR DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED JANUARY 15, 2024

## IMPORTANT

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTOR ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTOR'S PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.**

Creditors may read the specific provisions applicable to their class in Section V(B) of this Disclosure Statement.

## B. INTRODUCTION

### A. IDENTITY OF THE DEBTOR

SAL ATX, LLC is the Debtor. It is a Texas limited liability company which owns real property in Austin, Texas. The Debtor is owned by Ali Choudhri. Mr. Choudhri is an entrepreneur from Houston, Texas.

### B. GENERAL INFORMATION RE DISCLOSURE STATEMENT AND PLAN

The Plan which this Disclosure Statement accompanies is being promulgated by the Debtor (collectively "SAL ATX, LLC"). It has attempted to provide the maximum recovery to

each Class of Claims in light of the assets and anticipated funds available for distribution to Creditors. The Debtor believes that the Plan permits the maximum possible recovery for all Classes of Claims while facilitating the reorganization of the Debtor.

SAL ATX, LLC submits this Disclosure Statement pursuant to 11 U.S.C. § 1125 and Fed. R. Bankr. P. 3016 to all known claimants of Debtor for the purpose of disclosing that information which the Court has determined is material, important, and necessary for creditors and the Debtor's equity interests in order to arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of this Joint Plan.

This Disclosure Statement describes the operations of the Debtor as it impacts the distributions to creditors proposed under the Plan. However, it is not intended to replace a careful review and analysis of the Plan, including the specific treatment you as a creditor or equity holder will receive under the Plan. It is submitted as an aid and supplement to your review of the Plan in an effort to explain the terms and implications of the Plan. Every effort has been made to fully explain various aspects of the Plan as it affects Creditors and Equity Holders. If any questions arise, Movant urges you to contact the Debtor' counsel and every effort will be made to address your questions. You are, of course, also urged to consult with your own counsel.

A copy of the Plan is enclosed. Capitalized terms used therein, if not separately defined, have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules. Any accounting information contained herein has been provided by the Debtor and has been prepared using the cash method of accounting.

## C. DISCLAIMERS

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND 11 U.S.C. § 1125 AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR SUBMITTED HEREWITH.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.**

**NEITHER DELIVERY OF THE DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS**

**MADE IN CONNECTION WITH THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO SHOULD BE READ IN THEIR ENTIRETY PRIOR TO VOTING ON THE PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT WAS OBTAINED BY THE DEBTOR FROM THE RECORDS OF THIS CASE AND THEIR BUSINESS RECORDS.**

**D.    ANSWERS TO COMMONLY ASKED QUESTIONS**

As part of the Debtor's effort to inform Creditors regarding the Debtor's Plan and the plan confirmation process, the following summary provides answers to various questions which are often asked by a party receiving a disclosure statement.

**THE FOLLOWING SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.**

**B.    WHO IS THE DEBTOR?**

SAL ATX, LLC

**2.    HOW LONG HAS THE DEBTOR BEEN IN CHAPTER 11?**

Since September 5, 2023.

**3.    WHAT IS CHAPTER 11?**

Chapter 11 is the business reorganization provision of the Bankruptcy Code.  It permits a Debtor or a third party to submit a Plan providing for the sale, distribution or retention of Debtor's assets to be used for the repayment of its debts.

**5.    WHAT IS THE DEBTOR ATTEMPTING TO DO IN CHAPTER 11?**

The principal objective of a Chapter 11 case is confirmation of a plan of reorganization that enables a financially distressed debtor to restructure its assets and its debts.  A plan of reorganization sets forth the means for treating impaired

and unimpaired claims against a debtor.  A claim is impaired under a plan of reorganization if the plan provides that such claim will not be repaid in full or that the legal, equitable, or contractual rights of the holder of such claim will be altered. A claim is unimpaired if it will be paid in full or the legal, equitable, or contractual rights of the holder of such claim are not altered by the plan of reorganization.  A holder of an impaired claim generally is entitled to vote on a plan of reorganization if such claim has been allowed under Section 502 of the Bankruptcy Code.

6. **HAS THE DEBTOR PROPOSED A PLAN OF REORGANIZATION?**
   Yes.  The Debtor has filed a Plan as well as this Disclosure Statement.

7. **IF THE PLAN OF REORGANIZATION GOVERNS HOW MY CLAIM IS TREATED, WHY AM I RECEIVING THIS DISCLOSURE STATEMENT?**
   The Bankruptcy Code requires that a plan proponent solicit acceptances and rejections of its proposed plan before the plan can be confirmed by the Bankruptcy Court.  Before a plan proponent can solicit acceptances of its plan, the Bankruptcy Court must approve the disclosure statement and determine that the disclosure statement contains information adequate to allow creditors to make informed judgments about the plan.  After Bankruptcy Court approval of the disclosure statement, the disclosure statement, the proposed plan and a ballot are sent to the holders of claims.  The creditors then have the opportunity to vote on the Plan and should consider this Disclosure Statement for such vote.

8. **HAS THE COURT APPROVED THIS DISCLOSURE STATEMENT?**
   Before a plan of reorganization can be sent to creditors for voting, the Bankruptcy Court must find that the disclosure statement contains information of a kind, and insufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records to enable a hypothetical, reasonable investor typical of holders of claims of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's has approved the Disclosure Statement in this case but this approval does not constitute an endorsement of any of the information contained in either the Disclosure Statement or the Plan.  Likewise, although the Debtor and their counsel have utilized information believed to be accurate in preparing this Disclosure Statement, neither the Debtor nor their counsel warrant the accuracy of the information contained in or relied upon in preparing this Disclosure Statement nor should the Disclosure Statement be construed to be any representation or warranty whatsoever—express, implied or otherwise—that the Plan is free from risk, that acceptance or confirmation of the Plan will result in a risk-free or assured restructuring of the debts of the Debtor, or that the projections or plans of the Debtor for payment will be realized.

9. **WHY IS CONFIRMATION OF THE PLAN IMPORTANT?**
   Confirmation of the Plan by the Bankruptcy Court is necessary for the Debtor to provide the proposed treatment to Creditors under the Plan.  Unless the Plan is

confirmed, the Debtor are legally prohibited from providing you what has been proposed in the Plan.

10. **WHAT IS NECESSARY TO CONFIRM A PLAN OF REORGANIZATION?**
At the hearing scheduled by the Court, the Court will consider whether the Plan of Reorganization should be confirmed. Section 1129 of the Bankruptcy Code contains the requirements for confirmation of a Plan of Reorganization. **YOUR VOTE IS IMPORTANT.** In order for the Plan to be accepted, at least two-thirds in amount and more than one-half in number of the **voting creditors** in each class must affirmatively vote for the Plan. Even if all classes of claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan. The Court must find that the Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also complied with the Bankruptcy Code. The Court must also find that the Plan has been proposed in good faith and not by any means forbidden by law. The Court must find that the proponent of the Plan has disclosed the identity and affiliation of the persons who will manage the Reorganized Debtor after confirmation, that the appointment of such persons is consistent with the interest of creditors and equity security holders and with public policy, and that the identity and compensation of any insiders that will be employed or retained by the reorganized Debtor has been disclosed. The Court must additionally find that each class of claims has either accepted the Plan or will receive at least as much as it would under a Chapter 7 liquidation. The Code also provides for the treatment of certain priority claims. If any classes of claims are impaired under the Plan, the Court must find that at least one class of claims that is impaired has accepted the Plan without counting any votes by insiders. The Court must also find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor. Additionally, the Plan must provide for payment of fees to the United States Trustee.

If the Plan is not accepted by all classes of claims or interests, the Debtor may attempt to obtain confirmation under what is known as "cram-down." To obtain confirmation by cram-down, the Court must find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired by the Plan and has not accepted the Plan. The Code provides several options for a Plan to be "fair and equitable" to a secured creditor, which includes the secured creditor retaining its lien and receiving deferred cash payments at a market interest rate totaling either the value of the property securing the claim or the amount of the allowed claim as found by the Court, whichever is less. With respect to a class of unsecured claims, the requirement that a Plan be "fair and equitable" requires that the holder of an unsecured claim be paid the allowed amount of its claim or that no junior interest receive or retain any property on account of its prior claim. In the event that the Plan is not accepted by all classes, the Debtor will seek to obtain confirmation through "cram-down."

**11.   ARE CREDITORS ENTITLED TO VOTE ON THE PLAN?**

Yes.  Each impaired Creditor is entitled to vote on the Debtor's Plan.  If you are a Creditor, a ballot to be used for voting on the Plan has been distributed to you with this Disclosure Statement.  If you lose your Ballot, you may request another one from Debtor' Counsel.  Instructions for completing and returning the Ballot are set forth on the Ballot and should be reviewed carefully.

**12.   HOW WILL THIS PLAN TREAT MY CLAIM?**

People who are owed money by the Debtor hold what is known as a "claim."  The Plan organizes claims into classes based upon the type of claim and the treatment which it will receive under the Plan.  In order to determine how the Plan treats your claim, you must first determine which class covers your claim.  To find the treatment of your claim, look in the Table of Contents to find the category which best describes your claim or in the Claims Analysis attached hereto.

**13.   WHEN IS THE DEADLINE FOR RETURNING MY BALLOT?**

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots must be received by the Debtor no later than 5:00 p.m. Austin time, on the date set by the Court, at the following address:

> PLAN BALLOTS—SAL ATX, LLC
> BARRON & NEWBURGER, P.C.
> ATTN:  Steve Sather
> 7320 N. Mopac Expwy, Suite 400
> Austin, Texas 78731

You may also vote by facsimile transmission by sending your ballot to PLAN BALLOT—SAL ATX, Barron & Newburger, P.C., ATTN:  Steve Sather, (512) 476-9103 or by sending a "pdf" file of your scanned ballot attached to an email addressed to SSATHER@BN-LAWYERS.COM with the language "SAL ATX, LLC Ballot" in the subject line.

**IT IS IMPORTANT THAT ALL CREDITORS VOTE ON THE PLAN.  THE DEBTOR BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS. FOR THIS REASON, THE DEBTOR BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS AND RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## II. <u>INFORMATION CONCERNING THE DEBTOR</u>

**A.    OVERVIEW OF THE DEBTOR**

SAL ATX, LLC. is a Texas limited liability company. It was formed on March 31, 2022 for the purpose of purchasing and developing real estate located at 903 Edgecliff Terrace, Austin, TX 78704. The company is owned by Ali Choudhri, an entrepreneur and investor based out of Houston, Texas.
.

**B.    SIGNIFICANT EVENTS PRIOR TO BANKRUPTCY FILINGS**

*1.  Background*

SAL ATX, LLC purchased real property located at 903 Edgecliff Terrace, Austin, TX 78704 on August 1, 2022 from Brett Vance.  The contract sales price was $2,290,000. The property was appraised by Phillip F. Barletta as of June 11, 2022 in the amount of $2,160,000.00. The property was financed with a loan from Magnolia BridgeCo, LLC ("Magnolia") in the amount of $1,470,00.00.  The Debtor paid earnest money of $621,000 and paid $198,165.75 at closing. These funds were advanced by NIA ATX, LLC. The Debtor made the required interest payments on the Magnolia Note from August 2022 to April 2023 at which point a dispute arose between the parties.

After acquiring the property, the Debtor hired a contractor to clean up and secure the property. The Debtor spent at least $20,000.00 on these efforts. When the property was purchased, there was significant debris both interior and exterior. The roof on the back portion of the property had significant leaks that had to be repaired to maintain insurance. All exterior electrical components were removed at the request of Austin Energy to avoid a fire hazard. The property was boarded up to prevent homeless persons from occupying the premises and the property was winterized. The yard was maintained and some trees were removed to avoid code enforcement issues.

The Debtor signed a listing agreement with Mary Anne McMahon of RE/MAX Posh Properties, LLC on February 9, 2023. The listing price was $3,300,000.00. This price was set based on  comparable sales and the recommendation of the realtor. The Debtor received two expressions of interest during the period of the listing. On September 5, 2023, Ms. McMahon contacted Drew Dennett stating that an investor from New  York was interested in the property. The investor made a three-fold offer as follows:

| Offer # | Purchase Price | Downpayment | Other Terms |
|---|---|---|---|
| 1 | $3,300,000.00 | $1,000,000.00 | Principal only payments 40-year amortization Balloon payment in year 10 |

| 2 | $2,700,000.00 | $540,000.00 | Interest rate 3-5%<br>30 year amortization<br>No balloon payment |
| 3 | $2,900,000.00 | $435,000.00 | 4% interest rate<br>30 year amortization<br>Balloon payment in year 5-7 |

Deborah Dennett, the company's registered agent also received an unsolicited text message on December 11, 2023, from Jason Denny, a Keller Williams agent who stated that he had "several options for a preliminary cash offer with a range of $1,398,059 - $2,756,800."

### 2. *Events Leading to Bankruptcy*

On August 14, 2023, Magnolia posted Debtor's property for a foreclosure to take place on September 5, 2023. The property was posted based a dispute between the Debtor and Magnolia BridgeCo. Debtor believed that Magnolia had agreed to enter into a joint venture where the debt would be forgiven. Magnolia alleged that the property was posted based on failure to make note payments.

Debtor filed suit to obtain a temporary restraining order to prevent the scheduled foreclosure was taking place. The suit alleged that the lender had breached its contract by failing to provide adequate notice. An order granting the TRO was signed by the Court and a bond was posted.

## C. SIGNIFICANT EVENTS SINCE FILING BANKRUPTCY

The case was filed on September 5, 2023. The case was filed by James Pope, an in-house attorney for the beneficial owner of the Debtor. Mr. Pope filed the case because the Debtor was not sure that it would obtain a temporary restraining order in time to stop the foreclosure and pursued two strategies to prevent the foreclosure. Because Mr. Pope would not qualify as disinterested under 11 U.S.C. Sec. 330, the company sought out bankruptcy counsel who would meet the disinterestedness standard.

On September 29, 2023, the U.S. Trustee filed a Motion to Dismiss Case. The U.S. Trustee sought dismissal based on failure to timely file schedules and a statement of financial affairs as well as failure to respond to multiple requests for information from the U.S. Trustee.

On October 18, 2023, Debtor's current counsel entered a notice of appearance. The Debtor had previously sought to employ another firm with an Austin office, but the attorney had to decline due to a death in the family. The company was referred to Barbara Barron, at Barron & Newburger,

who had passed away in 2021. Eventually, the Debtor reached Stephen Sather at Barron & Newburger.

On October 20, 2023, Magnolia filed a Motion to Annul Automatic Stay.

On October 25, 2023, Debtor filed its Schedules and Statement of Financial Affairs. At this point, the schedules and statements were thirty-six days late.

On October 27, 2023, the Court entered an Order denying the Motion to Annul Stay. On November 1, 2023, the Court entered an Order on the U.S. Trustee's Motion to Dismiss which set certain benchmarks for the Debtor to achieve.

On November 7, 2023, the Debtor filed an application to employ Barron & Newburger, P.C. An order authorizing employment of Barron & Newburger was entered on December 4, 2023.

On November 22, 2023, BridgeCo filed a Notice of Rule 2004 Exam and Notice of Intent to Serve Subpoena.

On December 4, 2023, Debtor filed its Plan and Disclosure Statement.

On December 15, 2023, Debtor filed a Motion to Extend Time to Respond to Subpeona.

On December 20, 2023, Debtor's representative Drew Dennett was scheduled to appear for a deposition. Mr. Dennett stated that he would not be able to attend due to illness.

On December 22, 2023, BridgeCo filed a Motion to Compel Production of Documents and Deposition of Designee.

On December 28, 2023, the Court held an initial hearing on the Motion to Compel.

On December 29, 2023, the Court entered an interim order on the Motion to Compel.

On December 29, 2023, the Court entered an order granting Debtor's Motion to Extend Time to Comply with Subpoena.

On January 2, 2024, Drew Dennett appeared for an initial session of his Rule 2004 Examination.

On January 5, 2024, the Court held a second hearing on the Motion to Compel as well as the Debtor's disclosure statement.

On January 12, 2024, the Court entered a Second Interim Order on Motion to Compel.

On January 17, 2024, the Court held a second hearing on the Debtor's Disclosure Statement.

On January 19, 2024, the U.S. Trustee filed a Notice of Extension of Deadline for Debtor to Confirm Plan of Reorganization to March 4, 2024.

The Court has scheduled an oral ruling for January 24, 2024 on the issue of whether to grant BridgeCo's request for sanctions.

BridgeCo has indicated that it believes that Debtor's case was filed in bad faith and intends to file a Motion to Dismiss. Debtor disputes the allegation and will oppose the motion.

The Debtor has not taken any additional steps to market or improve the property since the bankruptcy case was filed other than to have unauthorized vehicles towed.

## D.    AFTER BANKRUPTCY

### 1.    Proposed Operations After Bankruptcy

Debtor intends to develop its property to construct a three-story luxury home and sell such property. Plans for the proposed construction are attached. The funds to develop the property will come from NIA ATX, LLC, another company owned by Ali Choudhri. The Debtor estimates that permitting will take 12 to 18 months, that teardown and construction of the new structure will take 12 to 18 months and that the property could be sold within three to six months once construction is completed. The Debtor will begin seeking a sale or refinance of the property once permitting is completed.

### 2.    Future Management of the Debtor.

The Debtor will be owned by NIA ATX, LLC. The manager of NIA ATX, LLC is Drew Dennett. The owner of NIA ATX, LLC is Ali Choudhri. The Plan proposes to cancel Ali Choudhri's ownership of the Debtor and issue new membership interests to NIA ATX, LLC, another company owned by Mr. Choudhri.

## III.  FINANCIAL INFORMATION

## A.    PRE-BANKRUPTCY

The Debtor had minimal financial operations prior to bankruptcy. When funds were needed, they were injected by the owners. The purchase of the property was funded with a note for $1,470,000 from Magnolia BridgeCo as well as $819,165,75 paid in earnest money and at closing. After acquiring the property, the Debtor made payments to Magnolia totaling approximately $120,000.00 and spent approximately $20,000.00 on insurance and maintenance of the property.

**B.     FINANCIAL RESULTS SINCE FILING BANKRUPTCY**

The Debtor has filed Monthly Operating Reports for the months of September, October and November 2023. The reports do not show any financial activity.

**C.     ESTIMATED FUTURE INCOME AND EXPENSES**

The Debtor will borrow $1,750.000.00 from NIA ATX, LLC to fund its operations until the property can be developed and sold.   These amounts will fall into three categories. First, there are payments to be made after the Effective Date as follows:

| | |
|---|---|
| Texas Comptroller | $ 1,011.41 |
| Travis County | $35,363.57 |
| Unsecured Claims | $ 1,220.96 |
| Total | $37,595.94 |

Next, there are forty-one months of payment to Magnolia BridgeCo. Assuming payments of $13,163.57, these payments will total $539,706.37.

Finally, there will be construction costs of approximately $900,000.00.

The construction budget of $3,398,000.00 is attached as Exhibit A. However, because it includes land acquisition costs of $2,500,000.00, the construction cost would be $898,000.000 which has been rounded up to $900,000.00. It is assumed that the Magnolia BridgeCo note will be paid from sales proceeds or refinancing.

## IV.  ANALYSIS AND VALUATION OF PROPERTY

**A.     REAL PROPERTY**

The Debtor owns real property located at 903 Edgecliff, Austin, TX 78704.   The legal description is Lot 8 and the West 25 feet of Lot 7, Block 52, Travis Heights. The property consists of 0.26 acres. The property has three structures on it: a 2,742 sq. ft. house, an 872 sq. ft. structure and a 468 sq. ft. structure. The Travis Central Appraisal District has valued the land at $1,144,000.00 and the structures at $810,601. The property was appraised at $2,160,000 before it was purchased by the Debtor. BBG has issued a preliminary appraisal report valuing the property at $2,660,000. However, this report has not been finalized.

The property was listed for sale at $3,300,000 prior to the bankruptcy filing.

The property is unique in that it is one of a small number of properties which can be developed on the South shore of Lady Bird Lake.

As discussed above, the Debtor received an offer with a range of $2.7 million to $3.3 million. However, the cash component of this offer would not have satisfied the Magnolia

lien. Additionally, the seller financing terms placed substantially all of the risk on the seller. More recently, a realtor indicated interest in the range of $1.3-$2.7 million.

The Debtor believes that it will be able to maximize the value of its property by tearing down the existing structures and building a new three story luxury home. The Debtor anticipates that the permitting phase will take twelve-eighteen months, the construction phase will take twelve-eighteen months and that the property could be sold within three to six months thereafter. As a result, the plan is estimated to take up to forty-two months. However, the Debtor will begin marketing the property once permitting is complete so that a sale or refinance could be accomplished prior to final renovation.



## B.    PERSONAL PROPERTY

The Debtor does not own any personal property other than that affixed to the real property.

## C.    LIQUIDATION VALUE

In a liquidation, Debtor estimates that the property would sell for at least $2.500.000.

## V.  SUMMARY OF PLAN OF REORGANIZATION

## A.    OVERVIEW OF THE PLAN

The Plan proposes to redevelop the property with a three-story luxury home and sell the property. NIA ATX, LLC will contribute funds to pay the ad valorem taxes and make interest payments to Magnolia during the construction and sale process and fund construction. Plans for

the proposed home are attached as Exhibit B. As discussed above, the costs to make plan payments prior to sale of the home will be approximately $600,000.00 and the construction costs will be approximately $900,000.00. The Magnolia claim will be paid from sale of the new home. The amounts listed for payments to Magnolia under the plan are only the interim payments to be made prior sale of the property.

## B.      ANALYSIS AND TREATMENT OF CLAIMS

### Class 1—Allowed Administrative Expense Claims.[1]

(a)     Class 1 consists of all Administrative Expense Claims (including, but not limited to, those arising under 11 U.S.C. § 503(b)(9)).

(b)     Each holder of an Allowed Administrative Expense Claim shall be paid the amount of its Allowed Administrative Expense Claim on the later of the Effective Date or within seven (7) days after the date a Final Order is entered approving the Administrative Expense Claim, unless otherwise agreed to by and between the Debtor and the holder of such claim or as otherwise set forth herein. The primary administrative expense claim to be paid under the plan will be the attorney's fees of Barron & Newburger, P.C. As of January 15, 2024, accrued fees which have not been submitted to the court total approximately $26,000.00.

(c)     No Administrative Expense claims, except for the fees payable under 28 U.S.C. Sec. 1930(a)(6) ("U.S. Trustee's Fees) and expenses incurred in the ordinary course of operating Debtor' business, shall be paid except as approved by Court Order.  Proofs of claim asserting Administrative Expense Claims, even if not objected to, shall not be sufficient to constitute approval of an Administrative Expense Claim.

(d)     Allowed Fee Claims incurred through Confirmation of professionals retained by the Debtor and of the Debtor will be paid upon entry of an Order by the Bankruptcy Court approving same with such fees to be paid on the later of the Effective Date or within seven (7) days after entry of a Final Order approving said Claim unless the parties agree to a later date.  After the Confirmation Date, the Debtor and his professionals may estimate fees necessary to complete these cases through the entry of a Final Decree.

(e)     Claims for U.S. Trustee's Fees incurred in the ordinary course of business will be paid by the Debtor as they come due, both before and after the Effective Date.

### Class 2—Allowed Priority Claims

(a)     Class 2 shall consist of Allowed Priority Claims. The Texas Comptroller has filed a claim consisting of a priority claim of $1,011.41 and an unsecured claim

---

[1] While administrative and priority claims are usually not "classified", the proponent of the Plan has done so in this case for ease of reference; the "classification" of these claims does not alter the statutory rights of such claimants under the Bankruptcy Code.

of $250.00.

(b) Class 2 shall receive payment of its Allowed Claim on the later of the date the claim becomes an Allowed Claim or March 1, 2024.

(c) Class 2 is impaired.

## Class 3—Secured Claim of Travis County

(a) Class 3 consists of the Secured Claim of Travis County. Debtor scheduled this claim as unknown. Travis County has not filed a claim yet. However, according to the Travis County Tax Office, the amount of the claim is $35,363.57.

(b) Class 3 shall retain its liens.

(c) Class 3 shall receive payment of the amount of its Allowed Claim, including post-petition interest at the statutory rate of 1% per month on March 1, 2024.

(d) Class 3 is impaired.

## Class 4—Secured Claim of Magnolia BridgeCo, LLC

(a) Class 4 consists of the Secured Claim of Magnolia BridgeCo, LLC. Magnolia has filed a proof of claim in the amount of $1,587,039.67.

(b) Class 4 shall retain its liens.

(c) Class 4 is an oversecured claim and is entitled to recover post-petition interest at the non-default contract rate as well as reasonable fees and expenses as provided in the contract. All post-petition interest accrued as well as any reasonable fees and expenses allowed by the Court shall be added to the amount of the Allowed Claim.

(d) Class 4 shall receive payment of its Allowed Claim as of the Effective Date in forty-one (41)equal monthly installments calculated based upon a Market Rate of Interest and a thirty-year amortization with the remaining balance of the Allowed Claim being fully due and payable forty-two (42) months after the Effective Date; provided, however, that the balance of the Allowed Claim shall become fully due and payable upon the closing of a sale of the Debtor's real property. Assuming a claim of $1,587,039.67, an interest rate of 10.0% and a thirty-year amortization, the monthly payments will be $13,225.33. At the conclusion of forty-two months, the balloon payment will be $1,551,906.74.

(e) Class 4 is impaired.

## Class 5—Claim of NIA ATX, LLC

(a) Class 5 consists of the Claim of NIA ATX, LLC. Debtor has scheduled the claim of NIA ATX, LLC at $1,000,000. The claim of NIA is based on the funds

provided to close the property and an assignment of opportunity.

(b) Class 5 shall not retain its liens.

(c) The pre-petition claim of NIA ATX, LLC shall be converted into equity on the Effective Date.  In addition, the Debtor shall execute the Post-Petition Draw Note as described in Section 8.01 of the Plan and NIA ATX, LLC shall advance funds to the Debtor as provided therein.

(d) Class 5 is impaired.

**Class 6—Unsecured Claims**

(a) Class 6 shall consist of Allowed Claims of Unsecured Creditors. Debtor is aware of the following unsecured claims:

Comptroller                             $250.00
Security State Bank & Trust      $970.96

(b) The Class 6 creditors shall receive payment of their Allowed Claims ninety (90) days after the Effective Date or on the date on which the claim becomes an Allowed Claim whichever is later.

(c) Class 6 is impaired.

**Class 7—Equity Interests**

(a) Class 7 shall consist of the Equity Interests of the Debtor. Ali Choudhri is the equity owner of the debtor.

(b) The Class 7 Equity Interests shall be canceled on the Effective Date.

(c) Class 7 is impaired.

### C.  FEASIBILITY OF THE PLAN AND RISK TO CREDITORS

Feasibility of the Plan and Risk to Creditors measures the likelihood that creditors will receive the payments promised to them.  In this case, the Plan depends upon NIA ATX, LLC being able to fund the development costs and other payments under the Plan. NIA will provide proof of its ability to contribute the required funds at the confirmation hearing. As discussed above, the project is expected to last up to forty-two months but could be sold or refinanced sooner depending upon market conditions.

### D.     REMEDIES FOR DEFAULT

In the event of a default by the Debtor  under the Plan and to the extent that the treatment of a particular class does not conflict with the provisions of this paragraph, creditors may exercise any rights granted to them under documents executed in connection with the Plan or any rights available to creditors under applicable non-bankruptcy contract law.  In the absence of documents executed to consummate or otherwise evidence the Plan, the Plan itself may be enforced as a

contract.  Notwithstanding any other provision, any creditor alleging a default in its treatment under the Plan shall give the Debtor twenty-eight days (28 days) notice and an opportunity to cure before exercising any rights available upon default.

In the event of a default by a creditor, the Debtor may enforce this Plan as a contract in a court of competent jurisdiction.  The Debtor may escrow payments to any creditor whose claim has not yet been allowed or who defaults under the Plan.  In the event of a default, the Debtor shall give the creditor twenty-eight (28) days' notice and an opportunity to cure before exercising this provision.

In the event that the Debtor's case is converted to one under chapter 7 after consummation of the Plan, these assets will revest in the Bankruptcy Estate and be subject to administration by the chapter 7 Trustee.

## E.  CLAIMS ALLOWANCE PROCEDURE

No Administrative Expense Claims shall be allowed except pursuant to Court Order.  Any application for allowance of an Administrative Expense Claim shall be filed within twenty-eight (28) days after the Confirmation Date or shall be barred.  Any claims for reimbursement of fees and expenses pursuant to 11 U.S.C. § 506(b) shall be filed within this same period of time or shall be barred.

Any Claims arising from the rejection of unexpired leases or executory contracts shall be filed by the earlier of the date specified in the order rejecting such lease or contract or twenty-eight (28) days after the Confirmation Date or shall be barred unless agreed otherwise.

A person who is found to have received a voidable transfer shall have twenty eight (28) days following the date from which the order ruling such transfer to be avoidable or approving the settlement of a suit on an avoidable transfer becomes a Final Order in which to file a Claim in the amount of the settlement or the avoided transfer, whichever is less.  Similarly, the claim of any party relating to contribution or indemnity against the Debtor which is contingent as of the Effective Date shall not be allowed unless:  (i) demand is made upon said creditor; (ii) the creditor satisfies the obligation in whole or in part; (iii) the creditor files a claim according to the procedures set forth in the Plan; and (iv) such Claim becomes an Allowed Claim.

A claim to which an objection has been made shall at the request of the Creditor be estimated by the Court for the purposes of voting on the Plan.

## F.  ASSUMPTION AND REJECTION OF LEASES AND CONTRACTS

Under the Bankruptcy Code, the Trustee must assume or reject any leases or contracts to which it is a party.  The Debtor does not have any executory contracts to assume or reject.

## G.  RELEASES

The Plan also contains a permanent injunction as follows:

**Permanent Injunction.** *Confirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against either Debtor that arose prior to the Confirmation Date, unless such action is authorized by this Plan or 11 U.S.C. § 1141.*

## H.  RETENTION OF JURISDICTION

After confirmation of the plan, the Court will retain jurisdiction to the extent provided by 28 U.S.C. § 1334. Basically, this means that the Court will retain jurisdiction over matters relating to the Plan and to rule on any matters which are still pending in the case.

## I.  POST-CONFIRMATION PROCEDURE

After confirmation of the Plan, the Court will rule upon any timely filed objections to claims and applications for compensation of professionals. Once the court has ruled upon these matters and distributions have begun, the Reorganized Debtor will file an application for final decree. The Plan requires the Debtor to file its application for final decree within six (6) months after confirmation, although the Debtor anticipate that this will occur sooner. Following the Effective Date, the Reorganized Debtor will be liable for all quarterly fees that become due to the United States Trustee under 28 U.S.C. § 1930(a)(6).

## VI.  <u>ALTERNATIVES TO THE DEBTOR'S PLAN</u>

The alternatives to a Plan of Reorganization in this case are: (i) conversion to a chapter 7 liquidation; and (ii) dismissal of the bankruptcy case.

## A.  CONVERSION

In a conversion, a Trustee would sell the Debtor's real property. While a sale would satisfy the claims of Travis County and Magnolia, it would not result in a significant distribution to NIA ATX, LLC.

## B.  DISMISSAL

If the case was dismissed, Magnolia could foreclose, taking the Debtor's equity for itself.

# VII. RELATIONSHIP OF DEBTOR WITH AFFILIATES

Under the Bankruptcy Code, an "affiliate" is an entity which owns at least 20% of the Debtor's equity interests or an entity in which Debtor owns at least 20% of its equity interests. Debtor does not have any affiliates under this definition.

# VIII. TAX CONSEQUENCES

The transactions contemplated by confirmation of the Plan may have an impact on the tax treatment received with respect to distributions under the Plan. That impact may be adverse to the creditor or interest holder.

An analysis of federal income tax consequence of the plan to creditors, interest holders, and the Debtor requires a review of the Internal Revenue Code ("IRS Code"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice. The Plan and its related tax consequences are complex. The Debtor has not requested a ruling from the Internal Revenue Service or an expert opinion with respect to these matters. Accordingly, no assurance can be given as to the IRS's interpretation of this Plan.

The federal income tax consequences of the implementation of the Plan to a creditor will depend in part on whether, for federal income tax purposes, the obligation from which a creditor's claim arose constitutes a "security." The determination as to whether an obligation for which a creditor's claim arose constitutes a "security" for federal income tax purposes is complex. It depends on the facts and circumstances surrounding the origin and nature of the obligation. Generally, corporate debt obligations evidenced by written instruments with maturities, when issued five (5) years or less, or arising out of the extension of trade credit, do not constitute "securities," whereas corporate debt obligations evidenced by written instruments with original maturities often (10) years or more constitute "securities." Although it appears that most of the creditors' claims do not constitute "securities," the Debtor expresses no view with respect to whether the obligation for which a particular creditor's claim arose constitutes a "security" for federal income tax purposes. Creditors are urged to consult their own tax advisor in this regard.

Generally, creditors whose claims arise from obligations that do not constitute "securities" or whose claims are for wages or services will be fully taxable exchanges for federal income tax purposes. Such creditors who receive solely cash in discharge of their claims will recognize gain or loss, as the case may be, equal to the difference between (i) the amount realized by the creditor in respect of its claim (other than any claim for accrued interest) and (ii) the creditor's tax basis in its claim (other than any claim for accrued interest). For federal income tax purposes, the "amount realized" by a creditor who receives solely cash in discharge of its claim will be the amount of cash received by such creditor. Where gain or loss is recognized by a creditor, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the creditor, whether the obligation from which a claim arose has been held for more than six (6) months, and whether and to what extent the creditor has previously claimed a bad debt deduction. The capital gains deduction for individuals and the alternate tax for corporate net capital gains have been repealed

and capital gain is currently taxed to individuals and corporations at their respective maximum tax rates.  However, the definitions of long-term and short-term capital gain or loss have to be repealed.

To the extent any amount received (where cash or other property) by a creditor is received in discharge of interest accrued on its claim during its holding period, such amount will be taxable to the creditor as interest income (if not previously included in the creditor's gross income).  Conversely, a creditor will recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any interest accrued on its claim was previously included in the creditor's gross income and is not paid in full.

**THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION OF THE PLAN MAY HAVE AN IMPACT ON THE TAX TREATMENT OF ANY CREDITOR OR INTEREST HOLDER.  THAT IMPACT MAY BE ADVERSE TO THE CREDITOR OR INTEREST HOLDER.  NOTHING HEREIN IS INTENDED TO BE ADVICE OR OPINION AS TO THE TAX IMPACT OF THE PLAN ON ANY INDIVIDUAL CREDITOR OR INTEREST HOLDER.  EACH CREDITOR OR INTEREST HOLDER IS CAUTIONED TO OBTAIN INDEPENDENT AND COMPETENT TAX ADVICE PRIOR TO VOTING ON THE PLAN.**

## IX.  PENDING AND POTENTIAL LITIGATION

### A.  PENDING PRE-BANKRUPTCY LITIGATION

The only action pending at the petition date was the suit to enjoin the foreclosure. This suit will be dismissed.

Each of the suits which remain pending will be resolved by the Plan.  Upon payment under the Plan, any claims or judgments against third parties will be deemed satisfied.

### B.  CLAIMS CREATED UNDER THE BANKRUPTCY CODE

There are four primary types of actions established by the Bankruptcy Code for the benefit of bankruptcy estates: (1) certain actions which could be brought by trustees, creditors or a good faith purchaser under 11 U.S.C. § 544, (2) actions to recover avoidable preferences under 11 U.S.C. § 547, (3) actions to recover fraudulent conveyances under U.S.C. §548 and (4) actions to recover unauthorized post-petition transfers under U.S.C. § 549.  A summary of these types of causes of action are listed below and, where possible, specific potential causes of action noted.

1.  **Preferences.**

Section 547 allows a Trustee to recover "voidable preferences"—*to wit,* payments made within ninety (90) days prior to bankruptcy (or within one (1) year if made to an insider) on an antecedent debt while the Debtor is insolvent which allows a creditor to recover more than it would have if the payment had not been made and the Debtor's assets were liquidated under chapter 7.  Certain payments are protected from recovery as

preferences.  These include payments made in the ordinary course of business or upon ordinary business terms and payments representing a substantially contemporaneous exchange.

2.    **Fraudulent Conveyances.**

Section 548 allows a Trustee to recover certain transfers made within two (2) years of the Petition Date while the Debtor was insolvent which either was made with fraudulent intent or was made without receiving reasonably equivalent value, as well as certain transfers avoidable under State law.

3.    **Other Claims Created By the Bankruptcy Code.**

Bankruptcy Code § 549 permits the Trustee to avoid a transfer of property that was not authorized under title 11 or the Court.

The Debtor is not aware of any Code created claims which it might pursue.

## C.    NON-BANKRUPTCY CAUSES OF ACTION

The Debtor is investigating whether it has claims against Magnolia BridgeCo based upon the joint venture agreement that Debtor believes was repudiated by BridgeCo. The claims by Sal ATX, LLC against Magnolia BridgeCo, LLC in Case No. D-1-GN-23-00487 will be dismissed without prejudice upon the Effective Date of the Plan.

### .    X  SOLICITATION OF VOTES

The Debtor has devoted substantial effort to prepare this Plan of Reorganization.  The Debtor believes that the Plan represents a fair adjustment of their relationship with the creditors. It believes that the Plan is superior to liquidation or forced sale of its assets outside of bankruptcy. Therefore, the Debtor requests that all parties approve the plan of Reorganization.

DATED:        January 22, 2024

Respectfully submitted,

**BARRON & NEWBURGER, P.C.**
7320 N. Mopac Expwy, Suite 400
Austin, Texas 78731
(512) 476-9103

By:   */s/Stephen W. Sather*
       Stephen W. Sather
       State Bar No. 17657520
       **ATTORNEY FOR DEBTOR**
       **SAL ATX, LLC**

## SALATX llc
## 903 Edgecliff Terrace Austin TX 78704 Project Budget

| | | |
|---|---|---:|
| 01-0000 | Land cost | 2,500,000 |
| 02-0000 | Purchase, loans, and taxes | 62,500 |
| 03-0000 | Soft costs, commissions | 115,200 |
| 04-0000 | Site preparation | 15,200 |
| 05-0000 | Foundation | 36,400 |
| 06-0000 | Framing | 125,400 |
| 07-0000 | Roofing & Windows | 45,000 |
| 08-0000 | Mechanical & Electric | 102,500 |
| 09-0000 | F-P Security Installation | 37,500 |
| 10-0000 | Sheet Rock | 52,500 |
| 11-0000 | Stucco, Brick, Stone, and garage door | 42,500 |
| 12-0000 | Paint | 16,500 |
| 13-0000 | Counter and Vanity Tops | 54,500 |
| 14-0000 | Flooring and wall tile | 42,500 |
| 15-0000 | Other-Interior | 51,000 |
| 16-0000 | Trim, Cabinets, doors, and paint | 42,500 |
| 17-0000 | Doors, Exterior | 6,000 |
| 18-0000 | Doors, Interior | 16,500 |
| 19-0000 | Outside - Flatwork, Fence, landscaping | 17,500 |
| 20-0000 | Miscellaneous - Maintenance, warranty, cleanup, port-a-can, dumpster | 16,300 |
| | | 3,398,000 |



**903 Edgecliff Terrace, Austin TX 78704**



SITE PLAN

SCALE: 1/8" = 1'-0"



**FIRE NOTE**

1) PROVIDE 5/8" TYPE 'X' GYPSUM BOARD TO THE GARAGE (& CARPORT) SIDE OF STUDS AND JOISTS.

2) INSTALL MINIMUM 1-3/8 IN. SOLID CORE DOOR, OR SOLID OR HONEYCOMB STEEL DOOR 1-3/8 IN. THICK, OR 20 MIN. FIRE RATED DOOR WITH SELF CLOSING HARDWARE FROM GARAGE AREA TO CONDITIONED AREA. (R302.5.1)

3) UNRATED DISAPPEARING STAIRS IN GARAGES TO HAVE MIN. 5/8" THICK FIRE RETARDANT PLYWOOD OR MIN. 16 GA. SHEET METAL.

4) PROVIDE 5/8" TYPE 'X' GYPSUM BOARD TO ENCLOSED AREAS LOCATED UNDER ALL STAIRS.



# SECOND FLOOR PLAN

SCALE: 1/4" = 1'-0"
10'-1" STUD HT. WITH 2 X 4'S @ 16" O.C. TYPICAL, U.N.O.  (UNLESS NOTED OTHERWISE)
PRIMARY FLOOR COVERING: CARPET U.N.O.

SUGGESTED FLOOR SYSTEM: 

*BATHTUBS AND SHOWER FLOORS AND WALLS ABOVE BATHTUBS WITH INSTALLED SHOWER
HEADS AND IN SHOWER COMPARTMENTS SHALL BE FINISHED WITH A NONABSORBENT SUR
PROVIDE METAL PAN W/2" DRAIN TO OUTSIDE IN UTILITY



THIRD FLOOR PLAN

SCALE: 1/4" = 1'-0"
10'-1" STUD HT. WITH 2 X 4'S @ 16" O.C. TYPICAL, U.N.O.  (UNLESS NOTED OTHERWISE)
PRIMARY FLOOR COVERING:  CARPET U.N.O.

SUGGESTED FLOOR SYSTEM: 

GAMEROOM



FRONT ELEVATION

SCALE: 1/4" = 1'-0"



# LEFT ELEVATION
SCALE: 1/4" = 1'-0"





# RIGHT ELEVATION

SCALE: 1/4" = 1'-0"





REAR ELEVATION
SCALE: 1/4" = 1'-0"

## SECTION A-A

SCALE: 1/4" = 1'-0"
SUGGESTED FLOOR AND CEILING SYSTEM AS NOTED ON DRAWING.

ATTIC

FAMILY

4:12 ROOF SLOPE
STANDING SEAM

34'-5" PARAPET W/METAL CAP

DROP BEAM
ROOF DECK

STORAGE

24'-0" PARAPET
W/METAL CAP

34'-0" PARAPET W/METAL CAP

42" HT. TEMP. GLS RAIL

STAIRS:
14 RISERS @ 7 3/8"
13 TREADS @ 10"

18" TRUSSES

44" HT. WALL W/METAL CAP

12" FLOOR JOIST

STAIRS:
20 RISERS @ 7 3/8"
19 TREADS @ 10"

GALLERY    BATH #2    CLOS.

36" HT. TEMP. GLS RAIL

42" HT. TEMP. GLS RAIL

18" TRUSSES

ENTRY

42" HT. TEMP. GLS RAIL

36" HT. TEMP. GLS RAIL

STUCCO

STAIRS:
4 RISERS @ 6 5/16"
3 TREADS @ 12"

FF: 415.0

HAG: 413.0
DFE: 413.0

FF: 415.0

LAG: 46.80

46.80

## FREESTANDING STAIR DETAIL

SCALE: 1/4" = 1'-0"
TYPICAL GEOMETRY

5060 FX.

2-LEG BENT FRAMES
EACH SIDE OF STAIRWELL

3-LEG BENT FRAMES IN
BETWEEN.

1-LEG STRINGERS TO
FINISH.

## SECTION B-B

SCALE: 1/4" = 1'-0"
SUGGESTED FLOOR AND CEILING SYSTEM AS NOTED ON DRAWING.

34'-0" PARAPET W/METAL CAP

38'-2" PARAPET W/METAL CAP

34'-5" PARAPET W/METAL CAP

ATTIC

24'-10" PARAPET W/METAL CAP

STAIRS:
14 RISERS @ 7 3/8"
13 TREADS @ 10"

AV          BATH #5

COMPOSITION SHINGLE
4:12 ROOF SLOPE

22'-4" PLATE HT.

42" HT. TEMP. GLS RAIL

36" HT. TEMP.
GLS RAIL

18" TRUSSES

44" HT. WALL
W/METAL CAP

STAIRS

STUCCO

FX.

STAIRS:
20 RISERS @ 7 3/8"
19 TREADS @ 10"

ANGLED
GLASS RAIL

42" HT. TEMP. GLS RAIL

MSTR. WARDROBE

METAL
MATCH
WINDOW TRIM

18" TRUSSES

KITCHEN

OPEN
UNDER
STAIRS

OPEN

FX.

FF: 415.0

HAG: 413.0

DFE: 413.0



KITCHEN



KITCHEN

PWDR.



LANAI



BATH #2

BATH #3

UTILITY

BATH #4

MASTER BATH

WARDROBE

BAR

BATH #5





**SOLAR READY ZONE REQUIRED** 2015 IRC APPENDIX U

PROVIDE A CONTINUOUS CONDUIT NO LESS THAN 1-1/4 INCH DIAMETER FROM ELECTRIC PANEL TO THE UNDERSIDE OF THE ROOF SHELL FOR FUTURE INSTALLATION OF SOLAR EQUIPMENT. THE MAIN ELECTRICAL SERVICE PANEL SHALL HAVE A RESERVED SPACE TO ALLOW FOR INSTALLATION OF A DUAL POLE CIRCUIT BREAKER AND SHALL BE LABELED "For Future Solar Electric".

# FIRST FLOOR
# ELECTRICAL
SCALE: 1/4" = 1'-0"





SECOND FLOOR
ELECTRICAL
SCALE: 1/4" = 1'-0"





THIRD FLOOR
ELECTRICAL
SCALE: 1/4" = 1'-0"

**MINIMUM ROOF/ATTIC VENTILATION**

R806.2 EXCEPTION: THE MINIMUM NET FREE VENTILATING AREA SHALL BE 1/300 OF THE VENTED SPACE PROVIDED AT LEAST 40 PERCENT AND NOT MORE THAN 50 PERCENT OF THE REQUIRED VENTILATING AREA IS PROVIDED BY VENTILATORS LOCATED IN THE UPPER PORTION OF THE ATTIC OR RAFTER SPACE.

| NET FREE VENTILATING AREA (NFVA) | |
|---|---|
| ATTIC AREA: | 2618 sq.ft. |
| MINIMUM NFVA - UPPER HALF OF ATTIC (@50%): | 628 sq.in. |
| MINIMUM NFVA - LOWER HALF OF ATTIC (@50%): | 628 sq.in. |
| TOTAL MINIMUM NFVA REQUIRED: | 1257 sq.in. |

**SOLAR READY ZONE REQUIRED** 2015 IRC APPENDIX U

A SOLAR READY ZONE IS REQUIRED HERE.
1. AN INDIVIDUAL PROJECTED ROOF PLANE HAS AN AREA OF MORE THAN 600 SQUARE FEET.
2. THE PROJECTED ROOF PLANE CAN PROVIDE FOR A MINIMUM 300 SQUARE FEET CONTIGUOUS SOLAR READY AREA.
SEE SOLAR READY DIAGRAM FOR QUALIFYING ROOF PLANES.
SEE SITE PLAN FOR BUILDING ORIENTATION AND ASSOCIATED NOTES.

**SOLAR READY DIAGRAM**
SCALE: 1/8" = 1'-0"
PROVIDE A SOLAR READY ZONE OF MINIMUM 300 SQUARE FEET CONTIGUOUS AREA WHEN A SINGLE PROJECTED ROOF PLANE EXCEEDS 600 SQ. FT.

SOLAR READY ZONE
330 SQ. FT.

BUBBLE NOTES:
1) ADJUST SLOPES TO MATCH RIDGES.
2) ADJUST OVERHANGS TO MATCH FASCIA.
3) ADJUST PLATE HEIGHT TO MATCH FASCIA.



**ROOF PLAN**
SCALE: 1/4" = 1'-0"
PLATE HEIGHTS AS NOTED.
SLOPES AS NOTED.
12" OVERHANGS FROM FRAME U.N.O.
8" OVERHANGS AT DORMERS U.N.O.
6" OVERHANGS AT DORMERS U.N.O.
SOFFIT AND RIDGE VENTING PER BUILDER SPEC'S.
ROOF MATERIAL - COMPOSITION SHINGLE
PLUMBING VENTS AND ALL OTHER PENETRATIONS THROUGH ROOF DECKING SHALL BE DIRECTED TO BACK ROOF SLOPE.
MINIMIZE PLUMBING VENT PENETRATIONS THROUGH ROOF DECKING.
COLOR COORDINATE PIPING TO ROOF MATERIAL WHERE APPLICABLE.



**RAISED SLAB ON GRADE**
FF: 44.50

**FOUNDATION OUTLINE**
SCALE: 1/4" = 1'-0"

DIMENSION OF DROPS AND LABELING OF SLOPES
TAKES PRECEDENCE ON THIS PAGE.

DROP VALUES (U.O.N.):
3 1/2" FOR PORCHES, TIRE STOPS, SHOWER STALLS.
1 1/2" FOR OVERHEAD DOORS.
12" FOR ELEVATOR PITS.

**TERMITE PROTECTION**    R38

PROVIDE A METHOD OR A COMBINATION OF METHODS FOR
TERMITE PROTECTION AS FOLLOWS:
a) CHEMICAL TERMITICIDE TREATMENT.
b) TERMITE BAITING SYSTEM.
c) PRESSURE-PRESERVATIVE-TREATED WOOD.
d) NATURALLY DURABLE TERMITE-RESISTANT WOOD.
e) PHYSICAL BARRIERS.
f) COLD-FORMED STEEL FRAMING.